Filed 7/22/26  P. v. Averill CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>DAVID STEVEN AVERILL,<br><br>        Defendant and Appellant. | A171424<br><br>(Sonoma County<br>Super. Ct. No. SCR-762854-1) |
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>THOMAS WILLIAM GRIEGO,<br><br>        Defendant and Appellant. | A171643<br><br>(Sonoma County<br>Super. Ct. No. SCR-762854-2) |

After a joint jury trial, defendants David Steven Averill and Thomas William Griego were found guilty of aggravated kidnapping under Penal Code section 209, subdivision (a) (section 209(a)), conspiracy, two assaults with a firearm, burglary, and other offenses.

In these consolidated appeals, Averill and Griego claim instructional error, insufficient notice of the prosecution's theories of aggravated kidnapping, and insufficiency of the evidence for aggravated kidnapping, assault with a firearm, and conspiracy to commit those offenses.

1

Averill also argues he should have been tried separately from Griego, their joint trial violated his Sixth Amendment rights, his trial counsel provided ineffective assistance in various ways, the prosecutor engaged in misconduct, and his convictions for possession of a firearm and ammunition violate the Second Amendment.

We affirm.

## FACTS AND PROCEDURAL BACKGROUND

By a fifth amended eight-count information, the Sonoma County District Attorney charged Averill and Griego with "[s]eizing and [d]etaining for [e]xtortion" victim Denise (§ 209(a))[1]; count 1); conspiracy to commit aggravated kidnapping, assault with a firearm, and residential burglary (§ 182, subd. (a)(1); count 2); two counts of assault with a firearm (§ 245, subd. (a)(2); counts 3 [victim Denise] & 4 [victim Ken]); wearing a mask or disguise for an unlawful purpose, a misdemeanor (§ 185; count 5); and first degree burglary with a person present (§ 459; count 8). Averill was further charged with possession of a firearm by a felon (§ 29800, subd. (a)(1); count 6); and possession of ammunition by a felon (§ 30305, subd. (a)(1); count 7).

Averill was alleged to have personally used a firearm in the commission of counts 1 and 8. (§ 12022.53, subd (b).) For Griego, it was alleged that a principal in count 1 was armed with a firearm. (§ 12022, subd. (a)(1).) The

---

[1] On appeal, defendants refer to count 1, violation of section 209(a), as "kidnap to commit extortion" and the Attorney General calls it "kidnapping for extortion." We will refer to a violation of section 209(a) as "aggravated kidnapping under section 209(a)" or "aggravated kidnapping." (See *People v. Harper* (2020) 44 Cal.App.5th 172, 190 (*Harper*) [section 209(a) describes four types of " 'aggravated kidnapping' "].)

We refer to the victims, Denise and Ken, by their first names in consideration of their personal privacy interests. (Cal. Rules of Court, rule 8.90(b)(4), (10).) Undesignated statutory references are to the Penal Code.

2

district attorney also alleged numerous sentencing factors in aggravation relating to the crime and to defendants.

At trial, Averill and Griego acknowledged that they went to the home of Denise and Ken on May 17, 2023, and tried to take property by force.[2] They did not dispute the authenticity of text messages between Averill and Griego sent in the days before May 17, which showed them discussing a plan to obtain cash that would require at least one firearm. But they contested the charges of aggravated kidnapping under section 209(a) and assault with a firearm, along with the charge of conspiracy to commit those offenses.

*The Prosecution's Case*

The prosecution's theory for aggravated kidnapping under section 209(a) was that Averill targeted the victims because he knew there was a safe hidden in their home; Griego agreed to help with Averill's plan to get money from the safe; and Averill and Griego threatened Denise with a gun, held her down and tried to tie her up, as argued in the prosecutor's closing argument, "in order to coerce her or Ken to give them the combination to the safe." At trial, the prosecution presented evidence of the following.

Denise and Ken are married and have lived at their residence in Sonoma County since the 1990's. They extensively renovated their property, rebuilding structures over the course of years while they lived on site. Averill was on the construction crew for several stages of the renovation project, including the final stage, which involved installing a safe in concrete under the floor of a walk-in closet in a bedroom in the main house. To access the safe, there is a hinged panel on the closet floor covered in carpet. (Ken

---

[2] In closing argument, Averill's counsel acknowledged that Averill attempted a home invasion robbery and told the jury to vote guilty on count 8 (first degree burglary). Similarly, Griego's counsel conceded there was a conspiracy to commit residential burglary and an attempted robbery.

described the safe as "well hidden.")  Only Denise, Ken, Ken's son, and the construction workers know the safe existed, and only Denise and Ken know the combination to the safe.

The property is enclosed by a six-foot fence with an automatic gate at the front.  The gate can be opened from the street side by using a keypad or from inside the house using a switch.  (So there is no way to open the gate from inside the front yard; one must go in the house.)

Shortly before 8:30 on the morning of May 17, 2023, Denise was doing yard work in the front yard with a leaf blower while Ken was asleep inside the house.  Denise decided to clear leaves on the street side of the gate, so she put the leaf blower down and went inside the house to open the gate.

Denise testified that when she returned to the front yard and picked up the leaf blower, she saw a man "completely masked with a gun" pointed at her.  She stumbled back and fell, and the man moved closer to her.  She yelled, and he told her to calm down.  She fell again, and the man got on top of her.  Denise began screaming for help, and the man said, " 'Be quiet or I'll shoot you.' "  Denise screamed and struggled, while the man with the gun straddled her and tried to keep her pinned down.  A second man appeared.  As the first man (with the gun) tried to hold Denise's wrists together, the second man tried to put zip-ties on her wrists.  At some point, the man with the gun "jumped up and the other guy got on top of [Denise] and he started saying to [her] 'don't turn this robbery into a murder.' "  The second man "started shoving a cloth in [her] mouth," and Denise bit him.  She heard "the sound of tape ripping" and thought someone was going to put tape over her mouth.  The men "started getting rougher with" Denise, and she felt gravel being pushed in her face.  She kept screaming for help.

4

Ken testified he was awakened by "a female voice screaming and the leaf blower at the same time." Ken got up quickly and went to the office, which has a large window facing the front yard. He slid open the window (a screen remained in the window frame) and saw Denise lying on the ground struggling with a man "clothed in black" who was on top of her. Ken yelled, and the man "got off of her and ran towards the window where [Ken] was." The man "used the gun in his hand" to "rip[] the [window] screen open." With "his arm pushed through" the window, the man pointed the gun at Ken and commanded him to lie face down or he would shoot. The man's gun was a black semi-automatic pistol. Ken got down on one knee and looked around his office for something he could use as a weapon. When the gunman turned to look toward Denise because she was screaming, Ken picked up a heavy office chair and threw it through the window at the man. The gunman stepped back and ran, and Ken saw him run off with another man. Ken went outside and helped Denise up from the ground. Her face was covered in blood. Denise testified she had a bloody nose, abrasions from the gravel, a strained groin muscle, and her right arm "became very black and blue from when they were trying to zip-tie" her.

Denise called 911 as did a neighbor who heard her screaming and went out to see what was going on. Witnesses saw a dark-colored four-door sedan speed away from the scene. Zip-ties, black duct tape, and strips of fabric were found in Denise and Ken's front yard.

Based on surveillance video, Sonoma County Sheriff's Detective Michael Matelli identified the getaway car as a 2010 Lexus registered to Averill in Vallejo. The same day, Sheriff's officers went to Averill's home and arrested him. In a search of Averill's residence, officers found black duct tape in his bedroom; a soft-sided rifle case containing a .20-gauge shotgun, a

5

plastic bag containing rounds of nine-millimeter ammunition, a handgun, a black zip-tie, and loose rounds of ammunition in a storage shed; and zip-ties in a trash can outside the shed. The handgun was a nine-millimeter semi-automatic SIG Sauer, and DNA testing showed "very strong support" for the conclusion that Averill's DNA was on the grip and slide of the handgun. In Averill's Lexus, officers found his wallet, a glass smoking pipe, a black hooded sweatshirt, a black zip-tie, and, in the trunk, a soft-sided pistol case with a $CO_2$ cartridge. A detective testified the glass pipe was a type usually used for smoking methamphetamine, and the cartridge could be used for a BB gun.

A search of Averill's phone yielded, among other things, text messages between Averill and Griego in which Averill discussed needing money and they both referred to firearms. On May 15, Averill texted to Griego in part, " 'I'm broke. Haven't been able to get any cash. I'm telling you this is as good as it gets. It's a no-brainer,' " and invited Griego to come see him. Later that day, Griego texted he was " 'working on getting a piece.' " (Matelli testified "piece" is slang for a firearm.) On May 16, Griego wrote that he couldn't " 'get a piece right now,' " and Averill responded, " 'It's actually better with one. One enforcing, one doing legwork. It's going to be simple, fast, and walk away with a hundred stacks each. 20 minutes. I got it all figured out.' " (Matelli testified that "a hundred stacks" meant "a hundred $100 bills," that is, $10,000.) He told Griego to come to his girlfriend's place and, " 'I'll walk you through it. I got everything you need.' " Griego wrote that he " 'would just feel better knowing the plan,' " and Averill responded, " 'That's why I need you to come early so we can go over everything.' " Averill texted, " 'This is good ass life changing money.' " Later the same day, Averill wrote to Griego that he got him a "shotty," which Matelli explained was a shotgun.

6

Detective Matelli arrested Griego on May 19 and interviewed him the same day. Matelli testified that during the interview, Griego admitted the texts found on Averill's phone were between him and Averill and admitted he had been at the victims' house on May 17, 2023.[3] Griego said he encountered an older woman. "He said he held her down; during the time while he was holding her down, she was screaming, kicking, hitting and trying to bite him," and "he was trying to put a gag in her mouth because she was screaming." Griego "said he was there to make some quick cash" and he expected to find cash "[i]n a safe in what he described as a studio."

Matelli monitored Averill's phone calls in jail and heard a conversation on May 26, 2023, between Averill and his girlfriend. Matelli testified that Averill's girlfriend asked him whether "a thing" "was near the raceway," and Averill responded, " 'No. It's by the Cherry Tree across the street.' " There is a fruit stand on Arnold Drive across the street from a winery called the Cherry Tree, and a deputy searched the area around the fruit stand in June and did not find anything. In October 2023, however, workers found a backpack at the winery across the street from the Cherry Tree. The backpack contained a hammer, a crowbar, zip-ties in pairs (in a "flex cuff position"), black duct tape, a firearm holster, a box cutter, a black mask, a black replica BB or airsoft gun, binoculars, and packaging for a "[p]rotective spray sock mask," which was for a mask different from the one found in the backpack.

*Averill and Griego's Defense*

Averill called Matelli in his defense case, and he testified as follows. Matelli believed the backpack found at the winery belonged to Averill and the

---

[3] Although Griego's interview was recorded, the jury learned about Griego's statements only through Matelli's testimony.

backpack had been at the crime scene on May 17, 2023. The replica handgun found in the backpack looks like the SIG Sauer found at Averill's residence. Matelli did not know if the replica handgun found in the backpack was an airsoft or BB gun. The $CO_2$ cannister found in Averill's car could be used for a replica handgun. Matelli never saw a safe at the victims' home. He did not know how the safe opens, whether anything of value was in the safe, or whether the safe could be broken into with a crowbar. As far as Matelli knew, the SIG Sauer firearm and the shotgun found at Averill's residence were not test fired although firearms collected as evidence "are normally test fired." In surveillance video taken from a house neighboring the victims' house, both defendants can be seen walking by the neighbor's driveway, and Averill appears to be wearing a backpack.

Counsel for Averill and Griego argued the evidence did not show either that defendants committed an aggravated kidnapping to extort the safe combination from anyone or that the apparent weapon used in the offenses was a real and operable firearm.

*Verdict and Sentence*

The jury found Averill and Griego guilty of all counts and found all enhancement allegations true. The jury also found true various factors in aggravation.

The trial court sentenced Averill to a determinate term of 27 years, four months, plus an indeterminate term of seven years to life in prison. Griego was sentenced to a determinate term of eight years, plus an indeterminate term of seven years to life in prison.

## DISCUSSION

On appeal, Averill contends he should have been tried separately from Griego and their joint trial violated his Sixth Amendment rights under

8

*Bruton v. United States* (1968) 391 U.S. 123. Averill and Griego both claim instructional error related to the aggravated kidnapping charge. Griego argues the trial court erred in failing to give a unanimity instruction. Both defendants contend they received insufficient notice about the theories of aggravated kidnapping that the jury was instructed on. Averill claims the prosecutor engaged in misconduct and his trial counsel was ineffective in various ways. Both defendants contend the evidence was insufficient to support their convictions of aggravated kidnapping, assault with a firearm, and conspiracy to commit those offenses. And Averill asserts his convictions for possession of a firearm and ammunition violate the Second Amendment under *New York State Rifle & Pistol Association, Inc. v. Bruen* (2022) 597 U.S. 1.

A.    *Averill's Claims Related to the Admission of Griego's Statements About Getting Quick Cash from a Safe*

As we have described, Detective Matelli testified that during Griego's post-arrest interview, Griego admitted he was at Denise and Ken's house, "said he was there to make some quick cash," and told Matelli he expected to find this cash "[i]n a safe in what he described as a studio."

On appeal, Averill raises three claims related to the admission of Griego's statements. He argues (1) the trial court erred in not allowing separate trials, (2) the admission of Griego's statements in the joint trial violated the confrontation clause of the Sixth Amendment under *Bruton*, and (3) if his Sixth Amendment claim is forfeited, defense counsel provided ineffective assistance. Averill's claims are forfeited, and his ineffective assistance claim fails.

1.    Procedural Background

On March 22, 2024, the prosecution filed a trial memorandum and motions in limine. In the trial memorandum, the prosecution described

9

Griego's statements to detectives. The prosecution wrote that the evidence would show Griego "said that he understood that a safe was installed on the property roughly 25 years before," "there was supposed to be a lot of money in the safe," and he "admitted that the plan involved using a gun in order to get [Denise and Ken] to give them the combination to the safe."

In the motions in limine, the prosecution argued Griego's statements to detectives were admissible as statements against penal interest. (Evid. Code, § 1230) The prosecution acknowledged that, to protect Averill's Sixth Amendment rights, Griego's statements "must be redacted in a way that doesn't refer to the existence of a codefendant."

On March 27, Averill filed motions in limine. In his motion in limine number 15, Averill "move[d] for an order granting a separate trial from his co-defendant, or in the alternative, an order requiring the deletion of any and all statements made by the co-defendant[] implicating him . . . ."

On March 28, the trial court heard argument on the parties' competing motions in limine regarding admission of Griego's statements. The prosecutor told the court she intended to question Detective Matelli "as to very directed points," so the jury would hear only certain statements made by Griego "that are against his penal interest [and] that aren't involving the co-defendant in any way." The trial court then heard Matelli's testimony about arresting and interviewing Griego. (The court stated it "just want[ed] to know what [the prosecution] is going to do at trial as far as [Griego's] statement alone.") Matelli testified that Griego admitted he was at Denise and Ken's house and, "He said supposedly there was a safe at the residence and he wanted to make some quick cash."

The trial court did not rule on the prosecution's motion seeking admission of Griego's statements or Averill's motion in limine number 15 that day.

At a hearing on April 2, Averill's counsel asked for confirmation that the statements the prosecutor elicited from Matelli at the March 28 hearing were "the only statements she's planning on eliciting through any hearsay exception." The prosecutor confirmed those were the only statements from Griego's interview that she intended to present to the jury. At the next hearing, Averill's counsel again confirmed the limited scope of the admissible evidence from Griego's interview with detectives. She asked whether the "statements made by Griego to Detective Matelli regarding a plan to coerce the [victims] to provide the combination to the safe" would be admissible.[4] The prosecutor stated that she had "decided against" asking to admit that statement, and the request to admit such evidence was withdrawn.

Averill's counsel did not mention the possibility of separate trials and did not ask the trial court to rule on defense motion in limine number 15 (for "a separate trial from his co-defendant, or in the alternative, an order requiring the deletion of any and all statements made by the co-defendant[] implicating him"), and it does not appear that the trial court ever separately ruled on that motion.

2.    Failure to Order Separate Trials

Averill's first appellate claim is that "[t]he trial court erred in not allowing separate trials due to the . . . statement of codefendant Griego to police about the safe combination in violation of the confrontation clause and

_____

[4] Recall that the prosecutor represented in her trial brief that in his interview with the Sheriff's detectives, Griego "admitted the plan involved using a gun in order to get [Denise and Ken] to give them the combination to the safe."

11

*Bruton*." (Bolding and capitalization omitted.) However, no evidence was presented at trial that Griego said anything about a safe combination in his interview, and, as we have just described, the prosecutor withdrew her request to present such evidence.

A trial court had no sua sponte duty to order separate trials for codefendants. (*People v. Maury* (2003) 30 Cal.4th 342, 392.) To the extent Averill's argument is that the trial court abused its discretion in denying his request for severance (motion in limine number 15), the argument is forfeited. As Averill himself recognizes on appeal, "[t]he parties ultimately reached an agreement as to what parts of the codefendant's interview would be admitted at trial." By agreeing to the admission of certain statements by Griego, Averill effectively withdrew his request for a separate trial. (See *People v. Cunningham* (2001) 25 Cal.4th 926, 984 ["Although defendant initially moved to sever, he subsequently agreed to stipulate to his ex-felon status as to that count, from which we may presume he intended to withdraw the motion for severance."].) Even if Averill did not intend to withdraw his request for separate trials, "his failure to press for a ruling waives the issue on appeal." (*Ibid*.) Accordingly, Averill may not raise this issue on appeal. (See *People v. Valdez* (2012) 55 Cal.4th 82, 143 ["because defendant failed to press the trial court for a ruling . . . , he may not raise the issue on appeal"].)

3. <u>Confrontation Clause Claim</u>

Averill's second appellate claim is that "[t]he trial court erred in admitting the portion of the statement of codefendant Griego to police about the safe combination in violation of the confrontation clause and *Bruton*." (Bolding and capitalization omitted.) But, again, no evidence was presented that Griego said anything about a safe combination.

In his reply brief, Averill explains that his claim of error relates to the evidence at trial that Griego told detectives he went to the victims' house to get some quick cash and he expected to find cash in a safe. As Averill acknowledges, however, he did not object to this evidence at trial (and, to the contrary, reached an agreement with the prosecutor about which statements by Griego would be admitted). His claim is therefore forfeited. (See *People v. Redd* (2010) 48 Cal.4th 691, 730 [defendant "did not raise an objection below based upon the confrontation clause, and therefore has forfeited this claim"].)

Averill suggests that this court should exercise its discretion to consider the claim of error despite forfeiture because the admission of Griego's statements affected his substantial rights. He does not explain how this is so, and we decline to exercise our discretion to excuse forfeiture. In any event, as we explain in addressing Averill's next claim of ineffective assistance of counsel, Griego's statements were admissible under the confrontation clause because they contained no reference either to Averill or to the existence of an accomplice. (See *Richardson v. Marsh* (1987) 481 U.S. 200, 211 (*Richardson*).)

4.      Claim of Ineffective Assistance of Counsel

Averill argues that if his confrontation clause claim is forfeited, then his trial counsel provided ineffective assistance of counsel. He argues, "There could be no valid tactical reason for trial counsel not to seek exclusion of the testimony about the safe combination."[5] But the record shows trial counsel was very concerned about Griego's statement regarding the safe combination, confirming more than once that the prosecutor would *not* elicit from Matelli

---

[5] For a third time, we note there was no evidence presented at trial that Griego mentioned a safe combination during his interview with detectives.

13

testimony about Griego's statement "regarding a plan to coerce the [victims] to provide the combination to the safe."

As to the evidence that was presented at trial, Averill's counsel reasonably did not object because the parties had reached an agreement as to what parts of the codefendant's interview would be admitted at trial, and the testimony elicited from Matelli at trial did not violate that agreement.

On appeal, Averill claims his trial counsel was ineffective in failing to object to the admission of Griego's out-of-court statement that he expected to find a safe with money at the victims' residence because admission of that evidence violates *Bruton*. Averill is mistaken. In *Bruton*, the United States Supreme Court "held that a defendant is deprived of his Sixth Amendment right of confrontation when the *facially incriminating* confession of a nontestifying codefendant is introduced at their joint trial, even if the jury is instructed to consider the confession only against the codefendant." (*Richardson*, *supra*, 481 U.S. at p. 207, italics added.) In *Richardson*, the court limited the *Bruton* rule to statements that " 'expressly implicat[e]' " a defendant, holding, "the Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when . . . the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence." (*Id*. at pp. 208, 211; see *People v. Fletcher* (1996) 13 Cal.4th 451, 467 [recognizing that a codefendant's statement may be introduced at a joint trial so long as it "is redacted to eliminate all references not only to the nondeclarant's name, but also to the nondeclarant's very existence"].)

Here, Matelli's testimony regarding Griego's statements eliminated any reference to the existence of Averill; Matelli described what Griego said he was doing at the victims' house without any mention of Averill or the fact

14

that he had an accomplice.  Thus, Griego's statements were admissible under *Bruton* and *Richardson*, and Averill's defense counsel acted reasonably in not objecting.  (See *People v. Aguirre* (2025) 18 Cal.5th 629, 707 [failing to make a meritless objection is not ineffective assistance].)

B.    *Jury Instructions*

1.    Instruction on Aggravated Kidnapping Under Section 209(a)

Averill and Griego both contend the jury instruction on aggravated kidnapping was legally flawed.  We disagree.

a.    *Section 209(a) and the Jury Instruction Given*

Section 209(a) provides in relevant part, "A person who seizes, confines, inveigles, entices, decoys, abducts, conceals, kidnaps, or carries away another person by any means whatsoever with intent to hold or detain, or who holds or detains, that person for [1] ransom, [2] reward, or [3] to commit extortion or [4] to exact from another person any money or valuable thing, or a person who aids or abets any such act, is guilty of a felony."

Thus, section 209(a) " 'describes four different types of aggravated kidnapping: (1) for ransom; (2) for reward; (3) to commit extortion; and (4) to exact from another person any money or valuable thing.' " (*Harper*, *supra*, 44 Cal.App.5th at p. 190.)  The third type—"to commit extortion"—does not require that property be obtained from a person different from the kidnap victim.  ("Kidnap victim" is generally understood to mean the person who is seized and confined; we will refer to this person as the "primary victim.")  Only the fourth type of aggravated kidnapping—"to exact from another person any money or valuable thing"—requires at least two individuals impacted by the offense, "a primary victim (the one who is seized and confined) and a secondary victim (the one from whom money or a valuable thing is exacted)." (*Ibid.*)

15

The jury in this case was instructed with a modified version of CALCRIM No. 1202 as follows:

"1202. Kidnapping: For Extortion or to Exact Consideration From Another Person

"The defendant is charged in Count 1 with Kidnap for Extortion.

"To prove the defendant is guilty of this crime, the People must prove that:

"1. The defendant seized, or confined a person;

"2. The defendant held or detained that person;

"2. When the defendant acted, he intended to hold or detain that person[6];

"3. The defendant did so to commit extortion, or to get from a different person money or something valuable; [¶] AND

"4. The person did not consent to being seized, or confined; [¶] AND

"5. The defendant did not actually and reasonably believe that the person consented to being kidnapped or abducted, or seized or confined, or concealed, or carried away, or inveigled, or enticed, or decoyed.

"It is not necessary that the person be moved for any distance.

"In order to *consent*, a person must act freely and voluntarily and know the nature of the act.

"Someone commits *extortion* if he or she intends to (1) obtain a person's property with the person's consent and (2) obtain the person's consent through the use of force or fear."

---

[6] The pattern jury instruction, CALCRIM No. 1202, provides alternatives for element 2 referred to as "<Alternative 2A—held or detained>" and "<Alternative 2B—intended to hold or detain that person>." Here, the trial court (perhaps mistakenly) gave both alternatives, but defendants do not claim this was error.

b.     *Defendants' Claim of Alternative-Theory Error*

Defendants argue the jury instruction given was flawed as to element 3, "The defendant did so to commit extortion, *or to get from a different person money or something valuable.*"  (Italics added.)  They claim element 3 as given to the jury amounted to "alternative-theory error," that is, it instructed the jury "with two theories of an offense, one of which is legally valid and one of which is legally invalid" (*In re Lopez* (2023) 14 Cal.5th 562, 567). Specifically, they assert the instruction incorrectly described "a hybrid offense which does not legally exist."  We are not persuaded.

As we have seen, section 209(a) describes four different types of aggravated kidnapping.[7]  The court in this case did not instruct the jury on the first two types ("for ransom" and for "reward") and did instruct the jury on the third type, "to commit extortion," and the fourth type, "to get from a different person money or something valuable" (which corresponds to the statutory language, "to exact from another person any money or valuable thing" (§ 209(a))).  These are two legally valid types of aggravated kidnapping.

Defendants argue the prosecutor misunderstood the law and conflated these two theories in her closing argument.  But even if this is so, that has nothing to do with whether the *jury instruction* given contained alternative-theory error.  The jury instruction in this case correctly described two legally valid ways the offense of aggravated kidnapping under section 209(a) may be

---

[7] Element 3 of the pattern instruction of CALCRIM No. 1202 tracks section 209(a), describing the four types of aggravated kidnapping under section 209(a) as follows: "3. The defendant did so (for ransom[,]/ [or] for reward[,]/ [or] to commit extortion[,]/ [or] to get from a different person money or something valuable)."

committed. Defendants fail to show instructional error based on the version of CALCRIM No. 1202 given.

2. Failure to Give A Unanimity Instruction

Griego also argues the trial court erred in denying a request for a unanimity instruction for the aggravated kidnapping charge.[8] We find no error.

The "requirement of unanimity as to the criminal act 'is intended to eliminate the danger that the defendant will be convicted even though there is no single offense which all the jurors agree the defendant committed.' [Citation.] . . . 'The [unanimity] instruction is designed in part to prevent the jury from amalgamating evidence of multiple offenses, no one of which has been proved beyond a reasonable doubt, in order to conclude beyond a reasonable doubt that a defendant must have done *something* sufficient to convict on one count.'" (*People v. Russo* (2001) 25 Cal.4th 1124, 1132 (*Russo*).)

"On the other hand, where the evidence shows only a single discrete crime but leaves room for disagreement as to exactly how that crime was committed or what the defendant's precise role was, the jury need not unanimously agree on the basis or, as the cases often put it, the 'theory' whereby the defendant is guilty. [Citation.] . . . [T]ypical examples include

---

[8] Averill's counsel asked the trial court to give CALCRIM No. 3500. The pattern jury instruction provides in relevant part: "The defendant is charged with <*insert description of alleged offense*> . . . . [¶] The People have presented evidence of more than one act to prove that the defendant committed the[/th]is charged offense . . . . You must not find the defendant guilty [of <*insert description of charged . . . crime[] requiring unanimity*>] unless you all agree that the People have proved that the defendant committed at least one of these acts and you all agree on which act (he/she) committed." (CALCRIM No. 3500.)

18

the rule that, to convict a defendant of first degree murder, the jury must unanimously agree on guilt of a specific murder but need not agree on a theory of premeditation or felony murder [citation], and the rule that the jury need not agree on whether the defendant was guilty as the direct perpetrator or as an aider and abettor as long as it agreed on a specific crime." (*Russo*, *supra*, 25 Cal.4th at pp. 1132–1133.)

"The key to deciding whether to give the unanimity instruction lies in considering its purpose. The jury must agree on a 'particular crime' [citation]; it would be unacceptable if some jurors believed the defendant guilty of one crime and other jurors believed her guilty of another. But unanimity as to exactly how the crime was committed is not required. Thus, the unanimity instruction is appropriate 'when conviction on a single count could be based on two or more discrete criminal events,' but not 'where multiple theories or acts may form the basis of a guilty verdict on *one discrete criminal event*.' [Citation.] In deciding whether to give the instruction, the trial court must ask whether (1) there is a risk the jury may divide on two discrete crimes and not agree on any particular crime, or (2) the evidence merely presents the possibility the jury may divide, or be uncertain, as to the exact way the defendant is guilty of a single discrete crime. In the first situation, but not the second, it should give the unanimity instruction." (*Russo*, *supra*, 25 Cal.4th at pp. 1134–1135, italics added.)

Here, the evidence for count 1, aggravated kidnapping under section 209(a), showed one discrete criminal event that occurred at Denise and Ken's residence around 8:30 a.m. on May 17, 2023, with one primary victim, Denise.

Griego argues there were "multiple factual scenarios presented to the jury" with an "initial incident involving the assault and detainment of

19

Denise" and "a separate ground for the charge which involved a separate set of facts with Ken as the victim." This is not convincing. The only person alleged and shown to have been seized and confined was Denise. There was no separate set of facts under which Ken could have been found to be the primary victim of an aggravated kidnapping. On the other hand, so long as all the jurors determined that defendants seized and confined Denise, it does not matter whether some jurors found that defendants did so to extort the combination from Denise, some found that defendants did so to extort the combination from Ken, and others found that defendants did so to get money or something valuable from Ken; these are merely different theories of one specific crime of aggravated kidnapping under section 209(a) in which Denise was the primary victim. "[T]he jury unanimity rule require[es] the jury to agree about the ultimate issue of whether the defendant is guilty of the charged offense. Any jury disagreement on subordinate issues is considered irrelevant. Specifically, . . . it does not matter if the jury disagrees about any facts proving the defendant guilty, even if based on differing theories." (*People v. Briscoe* (2001) 92 Cal.App.4th 568, 591.)

Moreover, "no unanimity instruction is required when the acts alleged are so closely connected as to form part of one continuing transaction or course of criminal conduct. 'The "continuous conduct" rule applies when the defendant offers essentially the same defense to each of the acts, and there is no reasonable basis for the jury to distinguish between them.' " (*People v. Dieguez* (2001) 89 Cal.App.4th 266, 275.) The continuous conduct rule applies here because the evidence showed only one closely connected course of criminal conduct. No unanimity instruction was required in this case.

20

C.    *Notice to Defendants of the Prosecution's Theories of Criminal Liability for Aggravated Kidnapping Under Section 209(a)*

In the fifth amended information, Averill and Griego were charged in count 1 with "the crime of Seizing and Detaining for Extortion in violation of PC209(a)," and it was alleged that Averil and Griego "did unlawfully seize, confine, inveigle, Denise . . . with intent to hold and detain, and who did hold and detain, Denise . . . for extortion, [*sic*]."  (The sentence ends with a comma and no period.)

Both defendants contend the trial court violated their due process rights on the ground they were "not given notice that the jury was going to also be instructed on *different offenses* than the one charged."  (Bolding and capitalization omitted, italics added.)  The premise of their contention is incorrect.  The jury in this case was not instructed on any offense different from the ones charged; in count 1, defendants were charged with aggravated kidnapping in violation of section 209(a), and the jury was instructed on that offense.  (See *People v. Ordonez* (1991) 226 Cal.App.3d 1207, 1227, fn. 12 [aggravated kidnapping in violation of section 209(a) "is a single crime, even though the offense may be committed in a large number of ways (e.g. seizing, confining, inveigling) and for any one of several related purposes (e.g. for ransom, reward or to commit extortion [or to exact from another person any money or valuable thing])"].)

The jury was instructed on two different ways of committing aggravated kidnapping in violation of section 209(a), one of which—seizing a person "to exact from another person any money or valuable thing"—was not alleged in the operative information.  But defendants fail to demonstrate this resulted in constitutionally insufficient notice.

"[O]ne accused of a crime must be 'informed of the nature and cause of the accusation.'  (U.S. Const., Amend. VI.)  Due process of law requires that

21

an accused be advised of the charges against him so that he has a reasonable opportunity to prepare and present his defense and not be taken by surprise by evidence offered at his trial." (*People v. Jones* (1990) 51 Cal.3d 294, 317.) Notice of the prosecution's legal theory for criminal liability is "constitutionally sufficient when the defendant is . . . alerted to the theory by the evidence presented at the preliminary hearing [citations], or by the People's express mention of that theory before or during trial sufficiently in advance of closing argument [citations]. What due process will not tolerate is the People affirmatively misleading or ambushing the defense with its theory." (*People v. Quiroz* (2013) 215 Cal.App.4th 65, 70–71 (*Quiroz*).)

Defendants argue they were not given constitutionally sufficient notice that the jury would be instructed that aggravated kidnapping includes seizing or confining Denise "to get *from a different person* money or something valuable." (Italics added.)[9] We disagree.

First, defendants were alerted to the evidence and the prosecution's theory of criminal liability under section 209(a) at the preliminary hearing. (See *People v. Diaz* (1992) 3 Cal.4th 495, 557 ["generally the accused will receive adequate notice of the prosecution's theory of the case from the testimony presented at the preliminary hearing or at the indictment proceedings"].) Denise and Ken testified at the preliminary hearing, and the prosecutor argued, "This is a 209(a). . . . [¶] Under [CALCRIM No.] 1202, . . .[¶] [e]lement 3 is the defendant did so [that is, seized the victim] for

---

[9] In support of the due process claim, Averill again asserts the jury instruction given includes an invalid "hybrid theory" of criminal liability. We reject this assertion. As we have explained, the jury instruction describes two legally valid types of aggravated kidnapping under section 209(a) of the four described—the third type, "to commit extortion," and the fourth type, "to exact from another person any money or valuable thing."

ransom, reward, or to commit extortion, or to get from a different person money or something valuable." The prosecutor further explained the basis for count 1 was that defendants' "plan was to take [Denise] and [Ken]" and "force them by force or fear while they're detained, give them the combination of the safe." Thus, the preliminary hearing gave Averill and Griego notice that the prosecution's position was that they intended to get the safe combination from Denise and/or Ken.[10]

Second, the parties discussed modifying CALCRIM No. 1202 and defendants learned that the instruction would include "to get from a different person money or something valuable" three days before closing arguments. (See *Morrison v. Estelle* (9th Cir. 1992) 981 F.2d 425, 428 [rejecting claim of constitutionally insufficient notice where defense "counsel had two days in which to prepare a closing argument" following the instructions conference].) Third, it does not appear that the prosecution "affirmatively misle[d] or ambush[ed] the defense with its theory." (*Quiroz, supra*, 215 Cal.App.4th at p. 71.)

Moreover, when the issue is late notice of a legal theory "for reasons other than prosecutorial gamesmanship," "courts have employed a harmless error test" that "looks to whether the late notice 'unfairly prevented [defense

_____

[10] Here, we note that the felony complaint filed in May 2023 (like the operative fifth amended information) identified only Denise as the victim defendants seized and confined in count 1; so defendants always knew that Denise was the *only alleged primary victim* of aggravated kidnapping under section 209(a). Averill argues that Ken does not meet the requirement of "a different person" for the fourth type of aggravated kidnapping because "he was a victim." But it was never alleged in count 1 that Ken was a primary victim (that is, it was not alleged that he was seized and confined). Exacting something of value from Ken qualifies as the fourth type of aggravated kidnapping under section 209(a) because Ken is "another person" (§ 209(a)), that is, he is a different person from Denise, the only alleged primary victim.

counsel] from arguing his or her defense to the jury or . . . substantially mislead [counsel] in formulating and presenting arguments.' " (*Quiroz, supra*, 215 Cal.App.4th at p. 71.)  While defendants suggest they would have presented a different defense if they had known earlier that the prosecution was going to argue that aggravated kidnapping included seizing and confining Denise to get the safe combination *from Ken*, they have not explained cogently or persuasively what they would have done or argued differently.

In sum, defendants received constitutionally sufficient notice of the charges against them, and, in any event, they have not shown prejudice.

D.    *Averill's Claim of Prosecutorial Misconduct*

Averill contends the prosecutor engaged in misconduct "by [1] eliciting an incorrect jury instruction, [2] commenting on it in closing argument, and [3] disparaging defense counsel."  (Bolding and capitalization omitted.)

We reject the premise of Averill's first claim of prosecutorial error.  The jury instruction given was legally correct.

Averill's second claim of prosecutorial error is that the prosecutor "argu[ed] to the jury during closing argument on three theories, leaving the jury with the false impression that there were three possible bases for the charge of kidnapping to commit extortion."  But Averill's counsel did not object to the prosecutor's statements he now complains about; so this claim is forfeited.  (See *People v. Diaz, supra*, 3 Cal.4th at p. 556 ["Because defense counsel failed to object at trial to these statements [by the prosecutor in closing argument], the issue may not be raised on appeal"].)

Averill's third claim of prosecutorial error is that the prosecutor disparaged defense counsel when she said in rebuttal, "There was an accusation by [Averill's counsel] that somehow the charging decision in this

24

case was politically motivated, that there's something to be gained by how we charged the case. These defendants aren't celebrities. They're not political figures. They're just criminals, like all the thousands of other criminals that we prosecute. That argument was baseless and offensive and had no business being part of this trial."[11] This claim is also forfeited because Averill's counsel did not object. (See *People v. Seumanu* (2015) 61 Cal.4th 1293, 1342 ["a timely objection would have been effective in preventing the harm that could have resulted from the alleged improper argument, and the failure to object thus forfeited the issue for appeal"].)

Recognizing that his current appellate claims of prosecutorial error are forfeited due to lack of objection at trial, Averill next argues his trial counsel was ineffective in failing to object. This argument is unavailing. " ' "[T]he decision facing counsel in the midst of trial over whether to object to comments made by the prosecutor in closing argument is a highly tactical one . . ." [citation], and "a mere failure to object to evidence or argument seldom establishes counsel's incompetence." ' [Citations] 'Representation does not become deficient for failing to make meritless objections' [citation], and there may be valid reasons why counsel may choose not to make even a meritorious objection [citations]. As one court has explained, 'From a strategic perspective, . . . many trial lawyers refrain from objecting during closing argument to all but the most egregious misstatements by opposing counsel on

---

[11] Here, the prosecutor apparently was responding to a portion of Averill's counsel's closing argument in which she said to the jury: "I'll tell you why we asked you to come here because you are the only government body that does not have ambition. You have a conscience. You are not looking for power. You are not looking for fame. And by protecting the rights of others, you, in fact, protect your own rights." Averill's counsel further argued, "For the government to stand before you and ask you to return verdicts of guilty on a kidnap for extortion is overreach."

the theory that the jury may construe their objections to be a sign of desperation or hyper-technicality.'" (*People v. Aguirre*, *supra*, 18 Cal.5th at p. 707.)

Here, we cannot say there could be no conceivable reason why defense counsel refrained from objecting. Averill's claim of ineffective assistance of counsel fails on direct appeal. (See *People v. Lopez* (2008) 42 Cal.4th 960, 972 ["except in those rare instances where there is no conceivable tactical purpose for counsel's actions, claims of ineffective assistance of counsel should be raised on habeas corpus, not on direct appeal"; "[t]his is particularly true where . . . the alleged incompetence stems from counsel's failure to object" to a prosecutor's comment].)

E.  *Sufficiency of the Evidence*

Averill and Griego both challenge the sufficiency of the evidence supporting their convictions of aggravated kidnapping under section 209(a) (count 1), assault with a firearm (counts 3 & 4), and conspiracy to commit those offenses (count 2).

"To assess the evidence's sufficiency, we review the whole record to determine whether *any* rational trier of fact could have found the essential elements of the crime or special circumstances beyond a reasonable doubt. [Citation.] The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence. [Citation.] 'Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the

26

exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence. [Citation.]' [Citation.] A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict. [Citation.]

"The same standard governs in cases where the prosecution relies primarily on circumstantial evidence. [Citation.] We 'must accept logical inferences that the jury might have drawn from the circumstantial evidence. [Citation.]' [Citation.] 'Although it is the jury's duty to acquit a defendant if it finds the circumstantial evidence susceptible of two reasonable interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court that must be convinced of the defendant's guilt beyond a reasonable doubt. [Citation.]' [Citation.] Where the circumstances reasonably justify the trier of fact's findings, a reviewing court's conclusion the circumstances might also reasonably be reconciled with a contrary finding does not warrant the judgment's reversal." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357–358.)

When a crime requires proof of specific intent, " '[e]vidence of a defendant's state of mind is almost inevitably circumstantial, but circumstantial evidence is as sufficient as direct evidence to support a conviction.' " (*People v. Manibusan* (2013) 58 Cal.4th 40, 87.)

1.      Aggravated Kidnapping in Violation of Section 209(a)

Extortion includes "the obtaining of property or other consideration from another, with his or her consent . . ., induced by a wrongful use of force or fear." (§ 518, subd. (a).) In this case, defendants do not dispute that the

wrongful use of force or fear to induce Denise or Ken to provide the combination of their safe with their consent would qualify as extortion. (See, e.g., *People v. Kozlowski* (2002) 96 Cal.App.4th 853, 858 [where two defendants asked the victim for the PIN for her ATM card, and the victim revealed the PIN because one defendant held a gun and the other had a knife, this was extortion for purposes of aggravated kidnapping under section 209(a)].)

Griego argues there was insufficient evidence to find defendants seized and confined Denise with the intent to commit extortion because they "never demanded the safe combination from Ken or Denise." Averill similarly argues neither defendant "said anything to Denise about giving consent or about the safe combination," and he asserts the evidence instead "unequivocally showed [Averill] using force or fear to take property against her will."[12]

The Attorney General responds that given the circumstances Averill knew the victims had a safe embedded in concrete in the floor of their home, he targeted the victims expecting that he and Griego would walk away with thousands of dollars in cash, and defendants would have known they could not carry the safe away, "the unavoidable conclusion is that [defendants] intended to compel [Denise and Ken] to give them the combination to the safe."

Further, Averill told Griego the plan involved " '[o]ne enforcing, one doing legwork,' " it would be " 'simple [and] fast,' " and he had " 'it all figured out' "; defendants went to Denise and Ken's house with zip-ties, duct tape,

---

[12] By defendants' logic, intent could never be determined unless defendants express their intent to the victims. But evidence of state of mind is often circumstantial, and circumstantial evidence of intent is sufficient to support a conviction. (*People v. Manibusan, supra,* 58 Cal.4th at p. 87.)

and cloth for gags; they tried to bind Denise's wrists and tape her mouth shut; and Griego later admitted he went there expecting to find cash in a safe. A reasonable finder of fact could infer that it would not be simple or fast to try to break into or steal the concrete-bound safe, but that Averill thought it would be simple and fast to open the safe if the combination could be extorted from Denise or Ken.

That defendants never asked for the safe combination does not negate the substantial evidence of their intent. As the Attorney General suggests, defendants "never demanded the safe combination because they never had enough control over Denise to do so." We conclude the evidence supports a reasonable inference that defendants seized and confined Denise intending to extort the safe combination from Denise or Ken. (The evidence also supports the conclusion that defendants seized and confined Denise to get from Ken the combination to the safe.)

2. <u>Assault with a Firearm</u>

"The fact that an object used by a [defendant] was a 'firearm' can be established by direct or circumstantial evidence." (*People v. Monjaras* (2008) 164 Cal.App.4th 1432, 1435.) " '[W]ords and actions, in both verbally threatening and in displaying and aiming [a] gun at others, [can] fully support[ ] the jury's determination the gun was sufficiently operable [and loaded].' [Citation.] Accordingly, jurors " 'may draw an inference from the circumstances surrounding the [offense] that the gun was not a toy.' " (*Id*. at p. 1437.)

Here, we have already described the evidence at trial showing that Averill and Griego talked about the need for firearms for their plan; that Averill pointed what looked like a gun at Denise and threatened to shoot her, then pointed the same object at Ken and threatened to shoot him; and that a

nine-millimeter semi-automatic SIG Sauer with Averill's DNA, along with ammunition and a zip-tie, were found in Averill's shed. The detective who found the firearm in Averill's shed testified there was ammunition inside the chamber, the magazine was loaded, and the firearm appeared ready to fire and operable.

In addition, Matelli testified about other text messages related to firearms that Averill sent in the days before the attack at Denise and Ken's house. The evening before the offenses, Averill wrote to a recipient called Brian, " 'I'm heading home. Got to grab some more ammo. Early morning.' " Brian responded, " 'You need 9 millimeter? I got some.' " Averill texted back, " 'Okay. I think I got enough. Would really like to borrow your guy's thing 'cause we are one short.' " A minute later, Averill texted Brian, " 'Could bring more collateral. I'm all in on this one.' " (Matelli testified that "collateral in this context meant weapons.) A minute later, Averill texted Brian, " '98 percent sure it won't even be used. I'm praying nothing has to be used.' "

Based on this evidence, a rational trier of fact could determine that Averill used a loaded, operable firearm to assault Denise and Ken on May 17, 2023.

Averill argues there was insufficient evidence to support the convictions of assault with a firearm because there was evidence that he could have used either an actual gun or a replica. Griego similarly argues there was "no direct evidence in this case to determine whether the gun that Averill brandished at the time Averill threatened the [victims] was . . . real and operable" and "there was considerable evidence to suggest that Averill used a replica firearm." These are not convincing arguments. Where the circumstances reasonably support the convictions, the fact that the evidence "might also reasonably be reconciled with a contrary finding does not warrant

the judgment's reversal." (*People v. Zamudio*, *supra*, 43 Cal.4th at p. 358.) There was ample evidence that Averill intended to use a real firearm, had access to a real firearm, and used a real firearm. That Averill also had access to a replica firearm does not defeat the substantial evidence showing he committed assaults on Denise and Ken with a firearm.

    3.    Conspiracy

Defendants raise the same arguments to challenge the sufficiency of the evidence for their convictions of conspiracy to commit aggravated kidnaping under section 209(a) and to commit assault with a firearm. We have concluded that substantial evidence supports the convictions of the substantive offenses, and we likewise find substantial evidence supports the convictions of conspiracy to commit the offenses. Based on the text messages, defendants' course of conduct, the evidence found in Averill's home and car, and Griego's statement to detectives, a rational trier of fact could determine that Averill and Griego conspired to commit aggravated kidnapping to extort from Denise or Ken the combination to their safe and that defendants conspired to assault the victims with an actual, loaded, operable firearm.

F.    *Averill's Claim of Ineffective Assistance of Counsel*

Averill claims his trial counsel was constitutionally ineffective in cross-examining a criminalist and in closing argument. This claim lacks merit.

In direct examination, a criminalist testified that he examined a nine-millimeter handgun using a stereomicroscope "view[ing] all angles on this pistol . . . looking for possible blood." He testified that he found "deposits that were consistent with what dried blood looks like.· But rust also looks very similar to dried blood.· And on a gun like this, any kind of metal . . . it's typical to find little deposits of rust." He conducted testing and concluded the deposits were not blood. In cross-examination, Averill's counsel asked the

31

criminalist what prompted him to use a reagent to test the firearm for blood. He responded, "Red or reddish deposits that could be visually similar to dried blood." The criminalist reiterated that rust was "typically what [he has] seen in [his] training and experience with any metal objects." Averill's counsel asked whether he did any further testing to ascertain whether the deposits were rust, and the criminalist responded that he did not. Averill's counsel had no further questions.

On appeal, Averill faults his trial counsel for not cross-examining the criminalist "further about the differences between the gun and the replica" and for failing to "discuss during closing argument the rust spots on the real gun in comparison to the description of the all-black replica."

"A defendant who raises the issue [of ineffective assistance of counsel] on appeal must establish deficient performance based upon the four corners of the record. 'If the record on appeal fails to show why counsel acted or failed to act in the instance asserted to be ineffective, unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation, the claim must be rejected on appeal.' " (*People v. Cunningham*, *supra*, 25 Cal.4th at p. 1003.)

We have no basis for finding trial counsel ineffective on direct appeal. Averill points to nothing in the record suggesting that the real firearm found in Averill's shed and the replica found in the backpack looked different from each other or that the weapon used in the offenses somehow looked more like the replica than the real firearm. Averill asserts there was affirmative evidence that the gun seen by witnesses "was new, shiny, and all black," but he provides no cite to the record for this assertion. In any event, the criminalist testified that he saw deposits upon examination under a stereomicroscope, viewing all angles of the firearm. Averill points to no

32

evidence suggesting either that such deposits would have been visible to the witnesses or that there were no similar deposits on the replica. Averill's claim of ineffective assistance of counsel based on asserted deficiencies in trial counsel's cross-examination of the criminalist and in her closing argument fails.

Averill also claims cumulative error caused prejudice. But he has failed to establish any error, so there is no cumulative error.

G.    *Averill's Second Amendment Claim*

Finally, Averill claims his convictions of possession of a firearm by a felon in violation of section 29800, subdivision (a)(1), and possession of ammunition by a felon in violation of section 30305, subdivision (a)(1), must be reversed because these statutes violate the Second Amendment on their face. We reject Averill's claim for the reasons explained by Division Three of our court in *People v. Anderson* (2024) 104 Cal.App.5th 577 (*Anderson*). (See *id*. at pp. 584–600 [concluding section 29800 and 30305 pass constitutional muster under the framework of *Bruen*].)

Averill urges us to reject *Anderson* and follow the 2-1 decision of a panel of the Ninth Circuit of the United States Court of Appeals, *United States v. Duarte* (9th Cir. 2024) 101 F.4th 657, 662, rehearing en banc granted, opinion vacated (9th Cir. 2024) 108 F.4th 786, and on rehearing en banc (9th Cir. 2025) 137 F.4th 743, certiorari denied (Jan. 20, 2026). But the decision Averill relies on has been vacated, and after rehearing the appeal en banc, the Ninth Circuit held the "permanent and categorical disarmament of felons is consistent with this Nation's historical tradition of firearm regulations." (137 F.4th at p. 761.)

We further observe that California Courts of Appeal have consistently rejected Second Amendment challenges to sections 29800 and 30305. (See

*People v. Bey* (2025) 108 Cal.App.5th 144, 161 ["California Courts of Appeal have consistently upheld section 29800 against constitutional challenge"]; *People v. Richardson* (2025) 108 Cal.App.5th 1203, 1211 [noting several courts have upheld "the constitutionality of sections 29800, subdivision (a)(1), 30305, subdivision (a)(1), and similar statutes" and citing cases].)[13]  Averill has not persuaded us that we should deviate from the conclusion reached by every California appellate court rejecting similar Second Amendment challenges to sections 29800 and 30305.

## DISPOSITION

The judgment is affirmed.

_____
Miller, J.

WE CONCUR:

_____
Stewart, P. J.

_____
Desautels, J.

A171424, *People v. Averill*
A171643, *People v. Griego*

---

[13] We also note that other federal circuits courts have rejected Second Amendment challenges to "federal statutes imposing firearm prohibitions on convicted felons."  (*In re E.J.* (2026) 119 Cal.App.5th 727, 734–735 [citing cases].)